# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

MARITZA N. GALLO,

Plaintiff,

- v -

Civ. No. 1:12-CV-1868
(LEK/RFT)

THE WONDERLY COMPANY, INC.,
C&G OF KINGSTON, INC.,
CLYDE E. WONDERLY, individually,
CHERYL JANSEN, individually, and
AL PARSONS, individually

Defendants.

**APPEARANCES:**                    **OF COUNSEL:**

LAW OFFICE OF D. JEN BROWN          D. JEN BROWN, ESQ.
*Attorney for Plaintiff*
40 Garden Street, Suite 202
Poughkeepsie, New York 12601

LAW OFFICE OF DRITA NICAJ           DRITA NICAJ, ESQ.
*Attorney for Plaintiff*
42 Catherine Street
Poughkeepsie, New York 12601

COOK, NETTER, CLOONAN, KURTZ & MURPHY, P.C.
*Attorney for Defendants*          ROBERT D. COOK, ESQ.
85 Main Street
Kingston, New York 12402

**RANDOLPH F. TREECE**
**United States Magistrate Judge**

## MEMORANDUM-DECISION and ORDER

    Maritza N. Gallo, an Hispanic woman of El Salvadoran ancestry/national

origin/race, filed a Complaint against the Defendants alleging that they violated her

rights under Title VII, 42 U.S.C. §§ 2000e *et seq*., 42 U.S.C. § 1981, New York Executive Law § 296 *et seq*., and intentionally inflicted emotional distress upon her. Dkt. No. 1, Compl., dated Dec. 20, 2012. Currently before the Court is Gallo's Motion to Amend her Complaint to join two new parties, pursuant to Federal Rules of Civil Procedure 15 and 19. Dkt. No. 29, Pl.'s Mot. to Am. Compl., dated Sept. 25, 2013. Defendants oppose Gallo's Motion. Dkt. Nos. 33, Patricia Schweikart's Aff., dated Oct. 3, 2013, & 34, Defs.' Mem. of Law, dated Oct. 17, 2013. Gallo files a Reply to Defendants' Opposition. Dkt. No. 37, Pl.'s Reply Mem. of Law, dated Nov. 1, 2013. For the following reasons, Gallo's Motion is **granted in part and denied in part**.

## I. BACKGROUND

### A. Complaint

The former Wonderly Company, Inc., owned by Clyde E. Wonderly, manufactured custom draperies and bedspreads for hotels since 1919. On or about December 14, 2011, the company's name became C&G of Kingston, Inc. Compl. at ¶¶ 8 & 9. Gallo worked for Wonderly Company on two occasions; from 1999 to 2009, and from 2010 to September 16, 2011. Cheryl Jansen was Gallo's immediate supervisor while Al Parsons was the General Manager. *Id*. at ¶¶ 7 & 8.

From March of 2003 to May of 2009, Gallo worked as Jansen's assistant. Gallo

alleges that during this period, because of her race, Jansen created a hostile working environment causing Gallo to resign in May of 2009. *Id*. at ¶¶ 10-12. Sometime thereafter Jansen also left Wonderly Company. *Id*. at ¶ 7. In September, 2010, Gallo returned to work for Wonderly Company and became the floor supervisor on February 18, 2011. *Id*. at ¶ 15. However, when Jansen returned to work for Wonderly Company near the end of May 2011, she was restored to her supervisory position on the floor while Gallo was summarily demoted to machine operator. *Id*. at ¶ 16. Gallo alleges that Jansen escalated racial hostilities toward her again: (1) she was assigned to a broken machine in the corner of the production floor and instructed not speak to any other employees; (2) she was repeatedly ridiculed because of her accent; (3) she was told by Jansen that she was not wanted there; (4) Jansen told others that she did not like Gallo because of her race; (5) on September 13, 2011, Jansen verbally abused her; and (6) Jansen had an openly hostile attitude toward Hispanic employees. *Id*. at ¶¶ 16-19. Because of these conflicts with Jansen, Gallo immediately met, on separate occasions, with Patricia Schweikart, who was the Controller and Supervisor of Human Resources, and Al Parsons, the General Manager, complaining that Jansen discriminated against her because she is Hispanic and El Salvadorian. *Id*. at ¶ 19. Approximately two days later, on September 16, 2011, Gallo's employment was terminated. *Id*. at ¶ 20.

Gallo alleges six causes of action. Under Title VII, she alleges that Defendants discriminated against her on the basis of race, color and national origin, and retaliated against her for filing a complaint. She also alleges that Defendants' racially motivated disparate and retaliatory treatment deprived her of rights guaranteed by 42 U.S.C. § 1981. Under New York State Executive Law § 296 *et seq*., she alleges that Defendants discriminated and retaliated against her, and, pursuant to this statute, names Jansen and Parsons individually as Defendants as "aiders and abettors." Lastly, she alleges that Defendants acted with the intent to cause her severe emotional distress. *See generally* Compl.

### B. Proposed Amended Complaint

Gallo seeks to amend her Complaint to add Schweikart and Northeast Commercial Window Treatments, Inc. ("Northeast Commercial") as defendants. In addition to the previously alleged conduct, Gallo complains that Jansen, Parsons, and Schweikart were the decision-makers responsible for terminating her employment with Wonderly Company; accordingly, Schweikart should be added as a defendant especially under the aider and abettor premise of New York State Executive Law § 296. Dkt. No. 29-2, Proposed Am. Compl. at ¶ 7. Gallo additionally alleges that Parsons met with her and took her complaint about racial discrimination, though no investigation nor action was taken. *Id*. at ¶ 12. Gallo further alleges that Parsons and

Schweikart formed Northeast Commercial and, on December 14, 2011, C&G of Kingston transferred all of its assets to Northeast Commercial who then conducted business as "Wonderly"; the transaction was structured with the intent of avoiding purchasing Wonderly Company's liabilities. *Id*. at ¶¶ 10 & 11.

## II. SCHEDULING ORDER AND FEDERAL RULE 16

Our first order of business must be to determine if this Motion to Amend is precluded because it may have been filed untimely and inconsistently with the Scheduling Order. The Scheduling Order set the final day to file a motion to amend the pleadings or join additional parties at April 21, 2013. Dkt. No. 13, Sch. Order, dated Mar. 6, 2013. In addition to the Motion being filed many months afer the deadline, Defendants cogently note that leave to amend must be balanced against the requirements of FED. R. CIV. P. 16(b). Dkt. No. 34, Defs.' Mem. of Law at p. 8.

A scheduling order exists to enable the court to manage the conduct and disposition of cases, and should not be ignored blithely. *Bernstein v. Bernstein*, 1993 WL 466402, at *1 (E.D.N.Y. Aug. 13, 1993). In fact, litigants must consider the nobility of a scheduling order and the consequences that may bear when not observed. However, a district court may "exercise its discretion under Federal Rule of Civil Procedure 16(b)(4) to determine whether the scheduling order should be modified so as to allow an amended complaint." *Kassner v. 2nd Ave Delicatessen, Inc*., 496 F.3d

229, 244 (2d Cir. 2007). When considering whether to modify a scheduling order, and referring to Rule 16(b)(4), "[a] schedule may be modified only for good cause and with the judge's consent."[1] Good cause should not be subject to either the subjective needs or caprice of the litigants but, rather, should be based upon an objective standard. *Bernstein v. Bernstein*, 1993 WL 466402, at *1. "[T]hese objective factors include the past conduct and diligence of the parties, the prior knowledge of the parties, the stage of litigation reached, and the nature of the relief sought." *Id*.

Accordingly, when a scheduling order exists, the "freely given" leniency standard found in Rule 15(a)(2) must be balanced against the "good cause" criterion mandated under Rule 16(b)(4) and this District's Local Rules. *High Point Design LLC v. Buyers Direct, Inc.*, 730 F. 3d 1301, 1318-19 (Fed. Cir. 2013) (citing, *inter alia*, *Holmes v. Grubman*, 568 F.3d 329, 334-35 (2d Cir. 2009)). Without balancing these interests, scheduling orders would be relegated "meaningless and effectively would read Rule 16(b) and its good cause requirement out of the Federal Rules of

---

[1] Regarding the extension of deadlines, the Northern District of New York's Local Rules mirror the Federal Rules:

> Deadlines that the Court institutes in any case management order shall be strictly enforced and shall not be modified by the Court, even upon stipulation of the parties, except upon a showing of good cause.

N.D.N.Y.L.R. 16.1(f).

Moreover, this District Court's standard Uniform PreTrial Scheduling Order states that modification would not occur "absent good cause shown."

*-6-*

Civil Procedure." *Parker v. Columbia Pictures Indus*., 204 F.3d 326, 340 (2d Cir. 2000) (quoting *Sosa v. Airprint Sys., Inc*., 133 F.3d 1417, 1419 (11th Cir. 1998)).[2]

A finding of good cause to modify a scheduling order will primarily depend upon the diligence of the moving party. *Holmes v. Grubman*, 568 F.3d at 334-35 (citing *Grochowski v. Phoenix Const*., 318 F.3d 80, 86 (2d Cir. 2003)); *Kassner v. 2nd Ave Delicatessen Inc*., 496 F.3d at 244 (finding the primary consideration in permitting leave to amend is whether the moving party can demonstrate diligence); *cf. Smith v. New York City Dep't of Educ*., 524 F. App'x 730, 733 (2d Cir. May 2, 2013) (noting that a district court has not abused its discretion in denying leave to amend if the party failed to establish good cause).

When there is a naked disregard of the scheduling order, it "undermine[s] the court's ability to control the docket, disrupt[s] the agreed upon course of the litigation, and reward[s] the indolent and cavalier." *Johnson v. Mammoth Recreations, Inc.,* 975 F.2d 604, 610 (9th Cir. 1992) (quoting *Parker v. Columbia Pictures Indus.,* 204 F.3d at 340). A litigant's inadvertence or oversight in honoring the scheduling order will not constitute good cause under Rule 16, *Bracey v. State of New York*, 2001 WL

---

[2] The significance of a scheduling order and Rule 16 cannot be overstated: "Disregarding of the [scheduling] order would undermine the court's ability to control its docket, disrupts the agreed-upon course of the litigation, and reward the indolent and the cavalier. Rule 16 was drafted to prevent this situation[,] and its standards may not be short-circuited by an appeal to those of Rule 15." *Johnson v. Mamoth Recreations, Inc*., 975 F.2d 604, 610 (9th Cir. 1992) (quoted in *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir. 2000) (alterations in the original)).

1550666, at *1 (S.D.N.Y. Nov. 28, 2001), if so, scheduling orders would be "meaningless." *AMW Mat. Testing Inc., v. Town of Babylon*, 215 F.R.D. 67, 71-72 (E.D.N.Y. 2003); *Kassim v. City of Schenectady*, 221 F.R.D. 363, 365 (N.D.N.Y. 2003) ("The importance of the [Uniform Pretrial Scheduling Order] to the district court's effective control and management of a case cannot be overstated.") (citations omitted)).  But when a party has diligently employed his time in conducting discovery and investigation, the request should be favorably received.  *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp*., 769 F.2d 919, 927-28 (2d Cir. 1985).  Or, if it is demonstrated that the deadline cannot be reasonably met despite the perseverance of the moving party, good cause will be established as well.  *Kassim v. City of Schenectady*, 221 F.R.D. at 366.

Gallo asserts that the evidence upon which to join both Schweikart and Northeast Commercial as defendants was recently "adduced during discovery and depositions."  Dkt. No. 29-1, Pl.'s Mem. of Law at p. 16.  Defendants contend the claim of newly discovered evidence is "disingenuous" and that Gallo knew of Schweikart and her role at Wonderly Company before this action was commenced.  Defs.' Mem. of Law at pp. 8-9.  "There was no new information that occurred during the course of discovery unknown to the plaintiff at the time that she filed her complaint."  *Id*. at p. 8.  But, Gallo refutes that charge and outlines what she did not

know about Schweikart and Northeast Commercial until engaging in discovery.

As mentioned above, Parsons served as General Manager while Schweikart served as Controller and "oversaw personnel." Dkt. No. 37-1, Schweikart's Dep., held on Aug. 9, 2013, at p. 8. Clyde Wonderly, the owner of Wonderly Company and now C&G of Kingston, considered Schweikart and Parsons as co-equals in managing Wonderly and any complaint from the floor would go to them; "if they thought it was important enough for me to know about, they would let me know." Dkt. No. 37, Pl.'s Reply Mem. of Law at p. 2 (citing Wonderly's Dep., held on Aug. 5, 2013, at pp. 54 & 73).[3] Also, Gallo subsequently learned that Schweikart was one of three persons who decided to terminate Gallo's employment, and that Schweikart "was the one that brought it to the table as a resolution of the ongoing problem." Dkt. No. 29-2, Ex. 4, Schweikart's Dep. at p. 101.[4]

---

[3] Clyde Wonderly's Deposition reads in part,

Q:      Who was on your management team?
A:      Al Parsons and Pat Schweikart.

****

Q:      And what was the chain of command?
A:      Al and Pat. And if they thought it was important enough for me to know about, they would let me know.

****

Q:      And [Al Parsons] would then report what he felt needed to be reported to Pat Schweikart?
A:      No, they discussed things together. They were a team.
Wonderly Dep at pp. 54 & 73.

[4] Schweikart's role in determining Gallo's employment fate with Wonderly Company is corroborated by Al Parsons's and Cheryl Jansen's Responses to Interrogatories. Dkt. No. 29-2, Ex. 6, Parsons's Resp. to Interrog., dated July 15, 2013, at ¶ 4; Ex. 7, Cheryl Jansen's Resp. to Interrog.,
(continued...)

Turning to Northeast Commercial, Gallo seeks to join this entity as a defendant under the theory of successor liability. Gallo claims that she did not know about this corporation's existence until July 8, 2013. Prior to July 8, 2013, Gallo sought a court conference to address Defendants' failure to respond to interrogatories that requested financial information. Dkt. No. 16, Pl.'s Lt., dated July 2, 2013. In response, Defendants stated their reasons for not responding to these interrogatories. Dkt. No. 19, Defs.' Lt., dated July 3, 2013. During the Discovery Hearing held on July 8th, it was revealed that ownership of the Wonderly Company may have been transferred to Northeast Commercial. Therefore, the Court directed Defendants to "respond to interrogatories and/or production of demands seeking financial worth, ownership, and transfer of ownership relative to Wonderly Company, C&G of Kingston, and to the extent the Defendants have access to the information, the transfer of assets to Northeast [Commercial] Windows." Dkt. No. 20, Text Order, dated July 8, 2013.

Subsequent to the July 8th Discovery Hearing, documents and depositions unveiled that Parsons and Schweikart entered into a Purchase Agreement to buy Wonderly Company's assets. Dkt. Nos. 33-1 & 33-2 (Asset Purchase Agreement).

---

[4](...continued)
dated June 12, 2013, at ¶ 9; *see also* Dkt. No. 37-1, Al Parsons's Dep., held on Aug. 5, 2013, at p. 136.

Contrariwise, Schweikart contends that they were deciding layoffs, and that she did not have the authority to hire or fire as either the Controller or head of Human Resources. Dkt. No. 33, Patricia Sweikart's Aff., dated Oct. 3, 2013, at pp. 4-5.

On or about September 12, 2011, Northeast Commercial was registered with the New York State Department of State. Dkt. No. 29-2, Ex. 9, Registration Statement. Then on December 19, 2011, Northeast Commercial and C&G of Kingston consummated the business/asset purchase transaction and Northeast Commercial began operating business at 25 Cornell Street, Kingston, New York, as Wonderly's. Dkt. Nos. 33, Patricia Schweikart's Aff. at p. 2; 33-3, Promissory Note, dated Dec. 19, 2011; 29-2, Ex. 8, Picture of Website, & Ex. 11, Bill of Sale with Assets Lists. Gallo posits that none of this was known until after deposing key parties and witnesses in August 2013. *See* Dkt. No. 29-2, Ex. 3, Parsons's Dep. at pp. 83-84; Dkt. No. 29-2, Schweikart's Dep. at p. 133; Dkt. No. 37-1, Ex. 13, Parsons's Dep. at p. 183; Dkt. No. 37-1, Ex. 15, Schweikart's Dep. at p. 135.

Gallo has established that she did not have this information when she filed her Complaint or prior to April 21, 2013. She has demonstrated due diligence through discovery and the recent revelation of these facts. Accordingly, the Court finds good cause for the belated filing of the Motion to Amend. The Court now proceeds with the balance of our inquiry.

## III. STANDARD OF REVIEW

### A. Motion to Amend

FED. R. CIV. P. 15(a) states, in pertinent part, that leave to amend a pleading should be "freely given when justice so requires." *Tocker v. Philip Morris Co., Inc.*, 470 F.3d 481, 491 (2d Cir. 2006); *Ellis v. Chao*, 336 F.3d 114, 127 (2d Cir. 2003); *Manson v. Stacescu*, 11 F.3d 1127, 1133 (2d Cir. 1993). Indeed, leave to amend should be denied only in the face of undue delay, bad faith, undue prejudice to the non-movant, futility of amendment, or where the movant has repeatedly failed to cure deficiencies in previous amendments. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Kropelnicki v. Siegel*, 290 F.3d 118, 130 (2d Cir. 2002) (citing *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 271-72 (2d Cir. 1996)). District courts are vested with broad discretion to grant a party leave to amend the pleadings. *SCS Commc'n, Inc. v. Herrick Co., Inc.*, 360 F.3d 329, 345 (2d Cir. 2004) (citing *Foman v. Davis*, 371 U.S. at 182, for the proposition that an "outright refusal to grant the leave without any justifying reason . . . is not an exercise of discretion [but] . . . merely [an] abuse of that discretion and inconsistent with the spirit of the Federal Rules"); *see also Local 802, Assoc. Musicians of Greater New York v. Parker Meridien Hotel*, 145 F.3d 85, 89 (2d Cir. 1998). "The party opposing a motion for leave to amend has the burden of establishing that granting such leave would be unduly prejudicial." *Media Alliance,*

*Inc. v. Mirch*, 2010 WL 2557450, at *2 (N.D.N.Y. June 24, 2010) (quoting *New York v. Panex Indus., Inc.*, 1997 WL 128369, at *2 (W.D.N.Y. Mar. 14, 1997)); *see also Lamont v. Frank Soup Bowl*, 2000 WL 1877043, at *2 (S.D.N.Y. Dec. 27, 2000) (citations omitted).  This requires the non-movant to "do more than simply claim to be prejudiced." *Breyette v. Amedore*, 205 F.R.D. 416, 417 (N.D.N.Y. 2002) (quoting *Bryn Mawr Hosp. v. Coatesville Elec. Supply Co.*, 776 F. Supp. 181, 185 (E.D. Pa. 1991)).

### B.  Joinder of a Party

As noted above, Rule 15(a) of the Federal Rules of Civil Procedure generally governs the amendment of complaints, but in the case of proposed amendments where new defendants are to be added, the Court must also look to Rules 18 - 20 and 21. *United States v. Commercial Bank of North America*, 31 F.R.D 133, 135 (S.D.N.Y. 1962) (finding that Rule 21 governs when Rules 18, 19, and/or 20 are involved); *Ward v. LeClaire*, 2008 WL 182206, at *3 (N.D.N.Y. Sept. 26, 2007) (citing *United States v. Chilstead Building Co.*, No. 96-CV-0641 (N.D.N.Y. Nov. 7, 1997) (McAvoy, C.J.) (citations omitted)).  Rule 21 states that a party may be added to an action "at any time [and] on just terms." FED. R. CIV. P. 21.[5]  Rule 21 is "intended to permit the bringing

---

[5] "Rule 21 cannot be read alone but must be read in the light of Rules 18, 19 and 20[.]" *United States v. Commercial Bank of North America*, 31 F.R.D. 133, 135 (S.D.N.Y. 1962). Although Gallo only raises Federal Rule 19, actually both Rules 19 and 20 are applicable.  With
(continued...)

in of a person, who through inadvertence, mistake or for some other reason, had not been made a party and whose presence as a party is later found necessary or desirable." *Phillips v. Lavalley*, 2013 WL 1681422, at *5 (N.D.N.Y. Mar. 1, 2013) (quoting *United States v. Commercial Bank of North America*, 31 F.R.D. at 135 ); . The addition of parties under Rule 21 is guided by the same liberal standard as a motion to amend under Rule 15. *See Ward v. LeClaire*, 2008 WL 182206, at *3; *Varela v. Cnty. of Rensselaer*, 2012 WL 1355212, at *7 (N.D.N.Y. Apr. 18, 2012) (quoting *Fair Housing Dev. Fund Corp. v. Burke*, 55 F.R.D. 414, 419 (E.D.N.Y. 1972)).

### C. Motion to Dismiss Standard

Where futility, as here, is the basis in opposing a motion to amend, the appropriate review standard is a motion to dismiss pursuant to Rule 12(b)(6). On a motion to dismiss, the allegations of the complaint must be accepted as true. *See Cruz v. Beto*, 405 U.S. 319, 322 (1972). Nevertheless, "the tenet that a court must accept

---

[5](...continued)
respect to Rule 19, it states, in part, that "[a] person . . . must be joined as a party if . . . in the person's absence complete relief cannot be accorded among those already parties." FED. R. CIV. P. 19(a)(1)(A). While, Rule 20 states, in part, that "[p]ersons . . . may be joined in one action as defendants if: (A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all defendants will arise in the action. FED. R. CIV. P. 20(a)(2). Rule 20(a)(2) is liberally construed "so as to promote judicial economy and to allow related claims to be tried within a single proceeding." *Equal Employment Opportunity Commission v. Nichols Gas & Oil, Inc.*, 518 F. Supp. 2d 505, 508-09 (W.D.N.Y. 2007) (citing, *inter alia*, *Barr Rubber Prods. Co. v. Sun Rubber Co.*, 425 F.2d 1114, 1127 (2d Cir. 1970)).

as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The trial court's function "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980).

A motion to dismiss pursuant to Rule 12(b)(6) may not be granted so long as the plaintiff's complaint includes "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007); *Ashcroft v. Iqbal*, 556 U.S. at 678 (citing *Twombly*). In that respect, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice." *Iqbal* at 678 (citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*, 556 U.S. at 678. This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Thus, in spite of the deference the court is bound to give to the plaintiff's allegations, it is not proper for the court to assume that "the [plaintiff] can prove facts [which he or she] has not alleged or that the defendants have violated the . . . laws in ways that have not been alleged." *Assoc. Gen. Contractors of California, Inc. v. California State Council of*

*Carpenters,* 459 U.S. 519, 526 (1983). The process of determining whether a plaintiff has "nudged [his] claims . . . across the line from conceivable to plausible," entails a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. at 680.

## IV. DISCUSSION

### A. Futility

As previously mentioned, leave to amend can be denied when there is undue delay, bad faith, undue prejudice to the non-movant, or futility of the amendments. It is the latter, futility, which is the predominate challenge to Gallo's Motion. The Second Circuit has stated that where futility is raised as an objection to the motion to amend, and

> [w]here it appears that granting leave to amend is unlikely to be productive, . . . it is not an abuse of discretion to deny leave to amend. *See, e.g., Foman v. Davis*, 371 U.S. at 182, 83 S.Ct. at 230 (denial not abuse of discretion where amendment would be futile); *Health-Chem Corp. v. Baker*, 915 F.2d 805, 810 (2d Cir. 1990) ("where . . . there is no merit in the proposed amendments, leave to amend should be denied"); *Billard v. Rockwell International Corp.*, 683 F.2d 51, 57 (2d Cir. 1982) (denial not abuse of discretion where plaintiff had had "access to full discovery" in a related case).

*Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993).

Here, both parties provided significant information outside the four corners of the Proposed Amendment Complaint, and the Defendants attack many of the proposed

allegations on credibility grounds. A review of a motion to amend, employing the Rule 12(b)(6) standard, is not an exercise in determining the merits of a claim or measuring the credibility or the extent of the actual facts. Such factual disagreements are not contemplated within a Rule 12(b)(6) framework, but rather are generally essential to and reserved for a Rule 56 analysis or at trial. FED. R. CIV. P. 56. Instead, the Court is required to accept the factual allegations in the proposed complaint as true and, my true function, at this juncture, "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of New York*, 375 F.3d 168, 176 (2d Cir. 2004) (quoting *Geisler v. Petrocelli*, 616 F.2d at 639); *accord Looney v. Black*, 702 F.3d 701, 708 (2d Cir. 2012) (noting that courts "are bound to make [their] determination based only on the contents of the complaint"). Accordingly, at this stage and for our purposes, the actual proof is not a requisite, only whether the proposed amended complaint states sufficiently factual allegations that are plausible. *New York v. Nat'l Serv. Indus., Inc*., 460 F.3d 201, 211 n.3 (2d Cir. 2006) (discussing its ruling in *Nettis v. Levitt*, 241 F.3d 186 (2d Cir. 2001), as to what is at stake at the motion to amend stage).

## B. Patricia Schweikart

The Proposed Amended Complaint alleges that Schweikart was the Controller

and Supervisor of Human Resources and that she was one of the "decision-makers responsible for terminating [Gallo's] employ[ment] with the Wonderly Company, Inc." Dkt. No. 29-2, Exs. 1 & 2, Proposed Am. Compl. at ¶¶ 6-7. After delineating the specifics of the hostile working environment created by Jansen, Gallo alleges Schweikart invited Gallo and her husband to dinner where Gallo complained that Jansen was mistreating her because she "is Hispanic and because of race, color, national origin and/or ancestry." *Id*. at ¶ 22.[6] Gallo further alleges that Schweikart "did nothing to address [Gallo's] concerns." *Id*. For these reasons, Gallo seeks to join Schweikart as a defendant under each of the pleaded causes of action.

The first two causes of action sounding in discrimination and retaliation are premised upon Title VII, 42 U.S.C. §§ 2000e *et seq*. Proposed Am. Compl. at ¶¶ 28-31. But, the Second Circuit has repeatedly stated that individual defendants with supervisory responsibility over a plaintiff are not personally liable under Title VII, even under the agency clause of the statute. *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003); *Hayut v. State Univ. of New York*, 352 F.3d 733, 753-54 (2d Cir.

---

[6] Schweikart gainsays Gallo's allegations. In addition to stating that she did not have the authority to hire or fire, Schweikart avers that at no time did Gallo tell her Jansen was treating her unfairly due to her race or that she was being subjected to discrimination in the workplace. Schweikart's Aff. at p. 4. Yet, Gallo's husband, John, testified that he told Schweikart "my wife made a comment to me that Cheryl [Jansen] said she needs to go back to her country or learn better English. That's discrimination, I said." Dkt. No. 29-2, Ex. 5, John Gallo's Dep., held on Aug. 9, 2013, at p. 70. But, as we mentioned above, it is not the Court's role, at this juncture, to assay the weight of the evidence or judge credibility. *See supra* Part IV.A.

2003); *Tomka v. Seiler Corp*., 66 F.3d 1295, 1314-17 (2d Cir. 1995).  Accordingly, Gallo cannot join Schweikart as a defendant under Title VII.

Gallo's Third Cause of Action pleads a deprivation of rights as guaranteed by 42 U.S.C. § 1981.[7]  The Second Circuit has likewise grappled with whether individuals may be held liable under § 1981.  Proposed Am. Compl. at ¶¶ 31-33. "Section 1981 provides a cause of action for race-based employment discrimination based upon a hostile working environment." *Whidbee v. Garzarelli Food Specialities, Inc*., 223 F.3d 62, 69 (2d Cir. 2000) (citations omitted).  "Most of the core substantive standards that apply to claims of discriminatory conduct in violation of Title VII are also applicable to claims of discrimination in employment in violation of § 1981[.]" *Patterson v. Cnty. of Oneida, New York*, 375 F.3d 206, 225 (2d Cir. 2004).  The Second Circuit has joined its sister circuits in explicitly holding that individuals may be held liable under § 1981, if it is demonstrated the individual is personally involved or there is "some affirmative link to causally connect the actor with the discriminatory action." *Id*. at p. 229 (citing *Whidbee*, 223 F.3d at 75).  Here, Gallo alleges that Schweikart was a decision-maker in her termination. The Proposed Amended Complaint inferentially charges that Gallo's termination was as racially inspired as

---

[7] 42 U.S.C. § 1981 states, in relevant part, that "[a]ll persons within the jurisdiction of the United States shall have the same rights in every State . . . to make and enforce contracts, . . . and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens[.]"

Jansen's allegedly racially-motivated hostile working environment. Although the allegations and inferences based upon racial discrimination may be reed thin, they are plausible enough to plead a § 1981 action against Schweikart.[8]

Next, the principal allegations against Schweikart pertain to New York's Executive Law § 296. The § 296 causes of actions alleging discrimination and retaliation are found in the Fourth and Fifth Causes of Action. Proposed Am. Compl. at ¶¶ 34-37. There are two premises upon which an individual may be liable for discrimination based upon race, color, or national origin under § 296:

> A supervisor is an "employer" for purposes of establishing liability under the NYSHR if the supervisor actually participates in the conduct giving rise to the discrimination. *Tomka [v. Seiler Corp.]*, 66 F.3d at 1317. In addition, the NYSHRL states that it shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article or attempts to do so. N.Y. EXEC. LAW § 296.

*Feingold v. New York*, 366 F.3d 138, 157-58 (2d Cir. 2004) (internal quotation marks and alterations omitted).[9]

That is, a co-worker who participates in conduct giving rise to discrimination can be held liable under § 296, "even though that co-worker lacked the authority to either

---

[8] The Court remarks again that these allegations may not make a sufficient showing to survive a motion for summary judgment. But that is not the standard the Court is required to apply to this Motion to Amend.

[9] The Second Circuit and courts within this District have noted that state courts are not in "unanimous agreement" with the *Tomka v. Seiler Corp.* ruling. *Feingold v. New York*, 366 F.3d 138, 158 n.19 (2d Cir. 2004); *Idlisan v. Suny Upstate Med. Univ.*, 2013 WL 495409 (N.D.N.Y. Jan. 16, 2013); *Hockeson v. New York State Office of Gen. Serv.*, 188 F. Supp. 2d 215, 221-22 (N.D.N.Y. 2002). But that question has been put to rest after *Feingold* to which this Court must follow.

hire or fire the plaintiff." *Id*. at 158.  Hence, an individual may be liable under § 296 if she took no action to remedy discriminatory behavior that she was aware of or terminated a plaintiff on the basis of impermissible factors. *Pellegrini v. Sovereign Hotels, Inc*., 740 F. Supp. 2d 344, 356 (N.D.N.Y. 2010) (citing *Feingold*, 366 F.3d at 158); *Hayut v. State Univ. of New York*, 127 F. Supp. 2d 333, 341 (N.D.N.Y. 2000) (noting that under § 296's aiding and abetting provisions, the allegations of failure to investigate or remediate state a claim against a supervisor who was on notice of the offensive conduct); *Ross v. Mitsui Fudosan, Inc.*, 2 F. Supp. 2d 522, 530 (S.D.N.Y. 1998) (noting that the company's president's knowledge of the misconduct and "calculated inaction" to the discrimination falls under the "rubric of condonation");[10] *Rosetti v. Hudson Valley Cmty. Coll.*, 1997 WL 567936, at *6 (N.D.N.Y. Sept. 8, 1997) (finding that managers or supervisors may be held individually liable if they aid and abet).

Here, the Proposed Amended Complaint states a cause of action against Schweikart as an aider and abetter under § 296.  Failing to investigate complaints of discrimination amounts to acquiescence in and aiding and abetting the creation of a

---

[10] An employer can be held liable for an employee's discriminatory acts if they encouraged, condoned, or approved of it. *Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 311-12 (N.Y. Ct. App. 2004). "An employer's calculated inaction in response to discriminatory conduct may, as readily as affirmative conduct, indicate condonation." *Matter of State Div. of Human Rights v. St. Elizabeth Hosp.*, 66 N.Y.2d 684, 687-88 (N.Y. Ct. App. 1985).

hostile working environment. *Pellegrini v. Sovereign Hotels, Inc.*, 740 F. Supp. 2d 344. Even if Gallo failed to evoke the magic word, "discrimination," or only limited evidence of her complaint about a hostile working environment was presented to human resources, such would not change the analysis of aiding and abetting. *Xu-Shen Zhou v. State Univ. of New York Inst. of Tech.*, 499 F. App'x. 105, 107-08 (2d Cir. 2012). Regardless of her lack of power to hire and fire, a failure to act or calculated inaction on her part are sufficient to state a cause of action under § 296 against Schweikart.

Gallo also alleges that after she and her husband complained to both Schweikart and Parsons about Jansen's discriminatory conduct, they retaliated against her by terminating her job. In order to plead a cause of action for retaliation, a plaintiff must allege that (1) she engaged in protected activity known by her employer, (2) she suffered an adverse employment action, and (3) there is a casual connection between the protected activity and the adverse employment action. *Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 312-33 (N.Y. Ct. App. 2004); *Bennett v. The Progressive Corp.*, 225 F. Supp. 2d 190, 211 (N.D.N.Y. 2002) (citations omitted).

An informal objection to unlawful discrimination to a management team constitutes a protected activity. *Bennett v. Progressive Corp.*, 225 F. Supp. 2d at 211 (citing *Matima v. Celli*, 228 F.3d 68, 78 (2d Cir. 2000) & *Sumner v. United States*

*Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)). Yet, failing to "use the word discrimination in complaining does not change the court's analysis for retaliation." *Xu-Shen v. State Univ. of New York Inst. of Tech.*, 499 F. App'x at 108. An adverse employment action is a materially adverse change in the terms and conditions of employment. *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000). Under this definition of adverse employment condition, without question, termination from employment would be found. *Malcolm v. Honeoye Falls Lima Cent. Sch. Dist.*, 483 F. App'x 660, 662 (2d Cir. 2012).

The causation element can be shown indirectly if the protected activity was followed closely by discriminatory treatment. *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 308 F. App'x 528, 529 (2d Cir. 2009) (quoting *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)). The Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a casual relationship between the exercise of a federal constitutional right and an alleged retaliatory action." *Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001). Suffice it to say, temporal proximity means very close. *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001). Gallo alleges she met with Schweikart and informed her about Jansen's mistreatment of her because she was Hispanic. She further alleges that she

and her husband met with Parsons on September 13, 2011, informing him of her good faith belief that Jansen was discriminating against her because of her race or ancestry. It is alleged that two days, later, on September 16, 2011, Parsons, Jansen, and Schweikart terminated Gallo. A two-day hiatus between the alleged protected activity and the adverse employment action would satisfy the casual connection element. *Terry v. Ascroft*, 336 F.3d 128, 152 (2d Cir. 2003) (finding that the protected activity was followed closely by discriminatory treatment) (citing *Richardson v. New York State Dep't of Corr. Servs.*, 180 F.3d 426, 444 (2d Cir. 1999)). For these reasons, Gallo has stated a cause of action for retaliation under § 296 against Schweikart.

## C. National Commercial and Successor Liability

Gallo seeks to join National Commercial as a defendant relying upon the doctrine of successor liability; conversely, Defendants claim that such successor liability is not applicable to this case and, thus, is futile. In essence, Gallo's proposed amendments allege that Wonderly continues to be an on-going business, notwithstanding that C&G of Kingson transferred all of its assets to National Commercial. Proposed Am. Compl. at ¶¶ 9-11.

In January 2001, Parsons and Schweikart, the management team of Wonderly Company, entered into a letter of intent and Purchase Agreement with Clyde Wonderly, president of Wonderly Company, for the inventory, machinery, equipment

vehicles, pending orders, and goodwill. Dkt. Nos. 33-1 & 33-2; Schweikart's Aff. at

p. 1. It is unclear when C&G of Kingston acquired Wonderly Company's assets but

we know that Clyde Wonderly and his wife are the sole shareholders.[11] On or before

September 12, 2013, Parsons and Schweikart formed National Commercial and the

assets were transferred to this new entity.[12] Dkt. No. 29-2, Ex. 9. The deal for the

assets, goodwill, and Wonderly's name was eventually accomplished by either

December 16 or 19, 2011. *See* Dkt. Nos. 33-3 & 33-4. And, on that same day,

National Commercial took over Wonderly's entire operation, assuming control over

the same employees, physical plant, website, and pending orders. Schweikart's Aff.

at p. 2; Dkt. No. 37-1, Parsons's Dep. at p. 183 (started business on Dec. 19, 2011);

Dkt. No. 37-1, Schweikart's Dep. at p. 135 (noting that they purchased the assets,

goodwill, continued with the employees, and recently purchased the building); Dkt.

No. 29-2, Ex. 8.

---

[11] Schweikart swears that "it was necessary for the Wonderly Company, Inc. to change its name due to the fact that we purchased the right to the use of the name Wonderly's[.]" Schweikart's Aff. at p. 2; *see also* Dkt. No. 37-1, Parsons's Dep. at 183 ("[T]he whole reason for Clyde to form C&G [was because] [w]e needed to have the Wonderly Company name.").

[12] A deposition sticker, dated August 5, 2013, placed upon a contract between C&G Kingston and National Commercial, infers that National Commercial may have been incorporated before then. *See* Dkt. No. 29-2, Ex. 11.

Also contrary to Schweikart's averments that Parsons and Schweikart transferred the assets to National Commercial, *see* Schweikart's Aff. at p. 2, this Contract with the lists of assets indicate otherwise, and that C&G of Kingston sold those assets directly to National Commercial. Dkt. No. 29-2, Ex. 11.

The parties would agree that the transaction was not in fact a merger, in the literal sense, or the sale of corporate stock, but rather was a transfer of the predecessor's substantial assets without assuming the liabilities. As a general principle of law, whether it is federal, traditional, or state common law, a corporation that acquires the assets of another corporation is not liable for either the torts or debts of the predecessor. *Graham v. James*, 144 F.3d 229, 240 (2d Cir. 1998) (state citations omitted); *Schumacher v. Richards Shear Co.*, 59 N.Y.2d 239, 244-45 (1983). However, under different legal theorems, both state and federal courts recognize exceptions to this maxim. But, which theorem is to be employed when determining whether an exception to the rule is applicable, remains ambiguous. Because of the Second Circuit's rulings in the *New York v. Nat'l Serv. Indus., Inc.* cases,[13] which will be explained below, for this Court, at least, there is no clear "delineation" as to what should be the appropriate test in determining successor liability in a Title VII case. *See Alvarez v. 40 Mulberry Rest., Inc.*, 2012 WL 4639154, at *4 (S.D.N.Y. Oct. 3, 2012) (mentioning that the Second Circuit has not definitely stated which common law is applicable to an FLSA case, a type of employment action);[14] *cf. Forde v. Kee*

---

[13] *New York v. Nat'l Serv. Indus., Inc.*, 352 F.3d 682 (2d Cir. 2003) (hereinafter *"Nat'l Serv. I"*) and *New York v. Nat'l Serv. Indus., Inc.*, 460 F.3d 201 (2d Cir. 2006 (hereinafter *"Nat'l Serv. II"*).

[14] On this note, the Fair Labor Standard Act of 1938, 29 U.S.C. §§ 201 *et seq.*, and Title VII,

(continued...)

*Lox Mfg. Co., Inc.*, 584 F.2d 4, 6 (2d Cir. 1978) (citing *E.E.O.C. v. MacMillan Blodel Containers, Inc.*, 503 F.2d 1086 (6th Cir. 1974) (identifying federal common law test of substantial continuity in employment discrimination cases). In this respect, there are two differing and maybe competing tests at issue: the traditional common law test[15] and the substantial continuity test. *Alvarez v. 40 Mulberry Rest., Inc.*, 2012 WL 4639154, at *4-5; *Medina v. Unlimited Sys. LLC*, 760 F. Supp. 2d 263, 269 (D. Conn. 2010) (indicating that because the Second Circuit has not definitively ruled on this matter, the lower courts in the Second Circuit have differed as to which test is applicable in employment cases, particularly FLSA cases). Because of the Court's uncertainty, and as a preface to my analysis, a discussion as to these two distinct tests is warranted.

---

[14](...continued)
pursuant to 42 U.S.C. § 2000e *et seq.*, are somewhat analogous in that they are generally viewed within the labor law umbrella of cases. *Equal Emp't Opportunity Comm'n v. Nichols Gas & Oil, Inc.*, 518 F. Supp. 2d 505, 511-12 (W.D.N.Y. 2007) (citing *New York v. Nat'l Serv. Indus., Inc.*, 406 F.3d 682, 690 (2d Cir. 2003), in support of the proposition that Title VII flows within a labor law context that drives an analysis under the federal common law substantial continuity test); *accord Alvarez v. 40 Mulberry Rest., Inc.*, 2012 WL 4639154, at *4 (S.D.N.Y. Oct. 3, 2012) (succinctly noting the same context for labor and employment cases).

[15] In the context of successor liability and the exceptions to the general rule, it is best understood that federal common law and traditional common law are virtually synonymous, and, for the most part, traditional common law and the common law of a particular state are essentially interchangeable in that "traditional common law would govern were [the Circuit] to hold that state law should be displaced in favor of a national rule" and "state law [refers] to the rule that would govern were [the Circuit] to hold that federal common law would not displace state law." *Nat'l Serv. II*, 460 F.3d at 206. In terms of cases occurring within New York, the Second Circuit held that New York's common law follows the traditional common law rules of successor liability. *Id.* at 203.

Historically, federal courts, including the Second Circuit, have recognized the benefit of national uniformity with respect to successor liability and accordingly have applied the substantial continuity test, particularly in the arena of labor law cases, *i.e.*, Title VII and actions brought under the Comprehensive Environmental Response, Compensation and Liability Act (hereinafter "CERCLA"). *B.F. Goodrich v. Betkoski*, 99 F.3d 505, 519 (2d Cir. 1996) (finding the substantial continuity test applicable in CERCLA cases); *Forde v. Kee Lox Mfg. Co. Inc.*, 584 F.2d at pp.5-6 (test is applicable to employment cases). Based upon *United States v. Bestfoods*, 524 U.S. 51 (1998), the Second Circuit re-evaluated its rulings in *Betkoski*. *See Nat'l Serv. I*, 352 F.3d 682. Addressing the issue of liability passing from one corporation to another, the United States ruled that CERCLA's failure "to speak to a matter as fundamental as the liability implications of corporate ownership demands application of the rule that in order to abrogate a common-law principle, the statute must speak directly to the question addressed by the common law." *Nat'l Serv. I*, 352 F.3d at 685 (internal quotation omitted). Finding that the substantial continuity test adopted in *Betkoski* departed from common law successor liability and not a part of the federal common law, the Second Circuit concluded that it was no longer good law in CERCLA cases, yet further noting, *in dicta*, that it may remain applicable in the labor law context. *Id*. at 685-87. Later, in *Nat'l Serv. II*, weighing whether traditional common law or state

common law was applicable in CERCLA cases, and determining that since New York common law did not depart from the traditional common law on successor liability, it appears that the Second Circuit, in addressing a choice of law issue, merged the principles under both jurisprudence to resolve, in part, an issue of successor liability. *Nat'l Serv. II*, 460 F.3d at 203, 206 & 209 (citing to both New York law and federal circuit cases and holding that New York common law follows the traditional common law rules on successor liability). This then begs the question, however, whether the pronouncement in *Bestfoods* and *Nat'l Serv. II* is confined solely to CERCLA cases, or may these precedents have a greater impact on a broader sphere of cases, such as Title VII. Giving considerable thought to this matter, there are, at least, a couple of lower courts that have concluded that *Bestfoods*' holding is not restricted to CERCLA cases, and opine that, after *Nat'l Serv. I* and *II*, there is some uncertainty as to whether substantial continuity test remains established law in Title VII employment cases. *See E.E.O.C. v. Nichols Gas & Oil, Inc.*, 518 F. Supp. 2d 505, 511 (W.D.N.Y. 2007); *Alvarez v. 40 Mulberry Rest., Inc.*, 2012 WL 4639154, at *5. And yet, historically, there has developed a body of law applying the doctrine of substantial continuity to Title VII cases. *E.E.O.C. v. Nichols Gas & Oil, Inc.*, 518 F. Supp. 2d at 511 (surveying cases); *see also Medina v Unlimited Sys. LLC*, 760 F. Supp. 2d at 269 (surveying cases). Because the lack of clarity, as to which test - traditional or

*-29-*

substantial continuity - is applicable here, and out of a sense of caution, the Court will apply both tests. *See De Ping Song v. 47 Old Country, Inc.*, 2013 WL 5498184 (E.D.N.Y. Oct. 3, 2013) (recognizing the distinctions between both tests and yet recognizing that there is no direct guidance from the Second Circuit, the court opted to accept the substantial continuity test).

## 1. Traditional Common Law Test

Under the traditional test, "a buyer of a corporation's assets will be liable as its successor if: (1) it expressly or impliedly assumed the predecessor's tort liability, (2) there was a consolidation or merger of seller and purchaser, (3) the purchasing corporation was a mere continuation of the selling corporation, or (4) the transaction is entered into fraudulently to escape such obligations." *Nat'l Serv. II*, 460 F.3d at 209 (quotation marks and citations omitted); *Douglas v. Stamco*, 363 F. App'x 100, 101-02 (2d Cir. 2010) (quoting *Nat'l Serv. II*); *United States v. Gen. Battery Corp., Inc.*, 423 F.3d 294, 305 (3d Cir. 2005); *City of Syracuse v. Loomis Armored US, LLC*, 900 F. Supp. 2d 274, 288 (N.D.N.Y. 2012). Courts have recognized that the mere continuation doctrine, espoused in the third element, and *de facto* merger, where a transaction, although not technically a merger, is in substance a consolidation of the seller and purchaser, "are so similar that they may be considered a single exception." *Cargo Partner AG. v. Albatrans, Inc.*, 352 F.3d 41, 45 n.3 (2d Cir. 2003); *Nat'l Serv.*

*II*, 460 F.3d at 209 (defining *de facto* merger). Nonetheless, the continuity of ownership is essential, and without it an exception to the traditional rule - purchase of the assets alone does not impose successor liability - cannot apply. *Nat'l Serv. II,* 460 F.3d at 211-12 (citing, *inter alia*, *Cargo Partners*, 352 F.3d at 46). In determining *de facto* merger or mere continuation, a court should consider the following:

> (1) continuity of ownership; (2) cessation of ordinary business and dissolution of the acquired corporation as soon as possible; (3) assumption by the purchaser of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the acquired corporation; and (4) continuity of management, personnel, physical location, assets, and general business operation.

*Nat'l Serv. II*, 460 F.3d at 209 (citations omitted).

It is not necessary that all four elements of the traditional common law theory be present in order to successfully plead successor liability. *Id.* at 211. Nor are the four factors of a *de facto* merger analyzed differently; they are weighed in a flexible manner, disregarding mere questions of form. *Nettis v. Levitt*, 241 F.3d 186, 194 (2d Cir. 2001); *City of Syracuse v. Loomis Armored US, LLC*, 900 F. Supp. 2d at 289 (citing *Nat'l Serv. Indus II*, 460 F.3d at 215 n.5).

### 2. Substantial Continuity Test

As noted above, the substantial continuity test has been consistently applied to Title VII cases in the lower courts. *E.E.O.C. v. Nichols Gas & Oil, Inc.,* 518 F. Supp.

2d at 511.[16] Under this test, the courts turn to three essential factors: (1) whether the successor had notice of the claim prior to the acquisition; (2) whether the successor substantially continued the business operations of its predecessor following the acquisition; and (3) whether the predecessor is able to provide the relief sought. *Lamar v. Inst. of Family Health*, 2011 WL 2432925, at *7 (N.D.N.Y. June 16, 2011) (citing *Nichols Gas & Oil, Inc.*, 518 F. Supp. 2d at 511); *Battino v. Cornelia Fifth Ave., LLC*, 861 F. Supp. 2d 392, 404 (citing the nine factors enumerated in *E.E.O.C. v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086, 1094 (6th Cir. 1974)). Like the traditional common law elements, "[n]o one factor is controlling, and it is not necessary that each factor be met to find successor liability." *Nicholas Gas & Oil*, 518 F. Supp. 2d at 512 (citations omitted).

### 3. Applying the Traditional Common Law and Substantial Continuity Tests

Turning first to the more rigorous of the two tests, the Court addresses the elements of the traditional common law test. Successor liability may attach when the

---

[16] Because of this body of law, United States Magistrate Judge Marian W. Payson, when analyzing a motion to amend, concluded that the substantial continuity doctrine is well-established in the area of Title VII employment law and accordingly conducted her analysis of successor liability under this doctrine. *E.E.O.C. v. Nichols Gas & Oil, Inc.*, 518 F. Supp. 2d 505, 511 (W.D.N.Y. 2007). However, because this Court submits that the matter remains unsettled within the Second Circuit, I am not prepared to adopt wholeheartedly Judge Payson's singular approach.

purchasing corporation is a mere continuation of the selling corporation or the transaction is entered into fraudulently to escape such obligations. "Thus, . . . . when a successor firm acquires substantially all of the predecessor's assets and carries on substantially all of the predecessor's operation, the successor may be held to have assumed its predecessor's liability, notwithstanding the traditional rule." *Aguas Lenders Recovery Group. v. Suez, S.A.*, 585 F.3d 696, 702 (2d Cir. 2009) (internal quotation marks and citations omitted). Here, Gallo alleges mere continuation in pleading successor liability.

With regard to the element of mere continuation, it is alleged, in particular, that Wonderly Company and National Commercial have in common several characteristics and traits that infer continuation of ownership. In an attempt to dispel the proposition of continuation of ownership by National Commercial, Defendants contend that C&G Kingston -- albeit asset-poor and without any visible operations – still exists. And, yet, courts have read the standard of flexibility into this analysis so that "other indicia of control over or continuing benefit from the sold assets might . . . be sufficient to satisfy the continuity of ownership factor." *City of Syracuse v. Loomis Armored US, LLC*, 900 F. Supp. at 289 (quoting *Nat'l Serv. Indus. II*, 460 F.3d at 215 n.5). Here, there are sufficient facts to support a continuation of ownership theory. The previous owner sold the business to his reliable and discrete management team, Parsons, who

was the General Manager, and Schweikart, the Controller and Supervisor of Human Resources. Prior to the sale when Wonderly Company existed, it is alleged that employment decisions were made by Parsons and Schweikart. For all practical purposes the management is the same under Northeast Commercial. Parsons and Schweikart, *via* National Commercial, continue to operate Wonderly's from the very same location and retaining the same employees. Parsons and Schweikart acquired all of the assets, including the goodwill and the name "Wonderly's." National Commercial acquired all pending orders while attempting to shed Wonderly Company's liabilities. It appears from the Exhibits that National Commercial is manufacturing the same draperies and spreads to the same line of customers, maintaining the same telephone number and website, and employing the same equipment and staff. *See City of Syracuse v. Loomis Armored U.S. LLC*, 900 F. Supp. 2d at 289, & *Alvarez v. 40 Mulberry Rest., Inc.*, 2012 WL 4639154, at *5 (both courts recognizing that successor liability may be appropriate as concomitant to the benefits it derives from the goodwill purchased). Reasonable inferences from these allegations urge us to conclude that there was a cessation of the previous business, an uninterrupted continuation of the acquired business, and a continuity of the management, personnel, location, assets and general business operation. *Nat'l Serv. II*, 460 F.3d at 209 (citations omitted). Furthermore, it is not necessary that all four

elements of the traditional common law theory be present in order to successfully plead successor liability and the analysis of each element should be flexible. *Id.* at 211.

There are sufficient facts alleged to nudge the Proposed Amended Complaint from conceivable to plausible. A failure to fully establish continuity of ownership in a proposed amended complaint is not fatal at this stage of the litigation. In allowing a plaintiff to amend the complaint, notwithstanding any shortcomings, the Second Circuit has held "simply that it could not be said, at the pleading stage, that the plaintiff could not bring forward evidence that there had been a de facto merger." *Nat'l Serv. Indus. II*, 460 F.3d at 212 n.3 (addressing its decision to allow an amended pleading even though plaintiff may have failed to establish continuity of ownership in *Nettis v. Levitt*, 241 F.3d 186 (2d Cir. 2001)). Notwithstanding any deficiencies in this regard, the Court finds that Gallo has sufficiently pled this element.

Similarly, the Court finds that there is successor liability under the substantial continuity test as well. Gallo alleges that Parsons and Schweikart – and thus National Commercial -- had notice of her claim of unlawful and discriminatory employment practices immediately prior to the transfer of the business operation. Proposed Am. Compl. at ¶¶ 22-26. Schweikart disclaims having any such notice. Schweikart's Aff. at p. 4. Setting aside issue of assaying credibility, there are sufficient facts to infer

that National Commercial had notice of the contingent liability when it fully consummated the purchased of substantially all of Wonderly Company's and/or C&G of Kingston's assets and commenced operations.

Regarding the second factor of substantial continuity test, for the reasons stated above in the traditional common law test analysis, the Proposed Amended Complaint alleges, *inter alia*, that National Commercial purchased substantially, if not all, of the assets, retained all of the employees, engaged in the same business and in the same manner, and operated from the same facilities using the same telephone number, website, and name.[17] There is a "substantial continuity in the identity of the work force across the change in ownership." *Forde v. Kee Lox Mfg. Co., Inc.*, 584 F.2d 4, 6. Whether C&G Kingston has been rendered insolvent and thus cannot provide an adequate remedy cannot be resolved on these allegations, but it is certainly a factor to be considered. However, a failure to hold a successor employer liable could "emasculate the relief provision of Title VII" leaving a plaintiff without a remedy. *Lamar v. The Inst. for Family Health*, 2011 WL 2432925, at *8 (citations omitted). That includes either compensatory or injunctive relief, or both. More discovery is obviously necessary. Realizing Gallo's difficulty in meeting this final factor and yet

---

[17] While *Alvarez v. 40 Mulberry Restaurant* was scrutinized under a summary judgment analysis, those facts relative to successor liability that the court noted when determining that there were issues of fact, are analogous to our facts. 2012 WL 4639154, at *6.

recognizing that the first two elements under the substantial continuity test weighs in Gallo's favor, the Court finds that there are sufficient factual allegations to justify the addition of National Commercial as a party defendant.

Accordingly, under either test, there are sufficient plausible factual allegations to justify joining National Commercial as a party.

### D. Scheduling Order

Pursuant to the Scheduling Order, discovery ended on November 21, 2013. Gallo states that no further discovery is needed now that she has all of the relevant documents and has deposed Schweikart. However, Gallo's contention is narrowly confined to her perspective and ignores the Defendants' view on these new theories. As mentioned above, further discovery may be necessary. Therefore, the Court amends the Scheduling Order as follows: (1) discovery deadline is **March 6, 2014**; (2) final day to file dispositive motion is **April 4, 2014**; (3) deadline for mediation is **March 6, 2014**; (4) the trial ready deadline is **June 27, 2014**; and, (5) the trial date is **July 15, 2014.**

For the reasons stated above, it is hereby

**ORDERED**, that Gallo's Motion to Amend her Complaint, Dkt. No. 29, is **granted in part and denied in part**; and it is further

**ORDERED**, that Gallo shall file her Amended Complaint within seven days

of the filing date of this Memorandum-Decision and Order. Unless Defendants agree to accept service on behalf of Schweikart and National Commercial, the Clerk of the Court shall issues summonses for both and they shall be served immediately; and, it is further

　　ORDERED, that the Scheduling Order be amended as stated above.

　　IT IS SO ORDERED.

January 6, 2014
Albany, New York

_____
Randolph F. Treece
U.S. Magistrate Judge